PEOPLE v CONLEY

Docket No. 258400. Submitted March 8, 2006, at Lansing. Decided March 16, 2006, at 9:10 a.m. Leave to appeal sought.

Aaron D. Conley was convicted by a jury in the Ingham Circuit Court, Thomas L. Brown, J., of first-degree home invasion, felonious assault, and possession of a firearm during the commission of a felony. The defendant was sentenced as a third-offense habitual offender to concurrent terms of 16 to 40 years and four to eight years of imprisonment for the convictions of first-degree home invasion and felonious assault, respectively, and to a term of two years of imprisonment for the felony-firearm conviction, to be served consecutively to the concurrent terms. The minimum terms of the concurrent sentences were within the sentencing guidelines range. The defendant appealed.

The Court of Appeals *held*:

1. The trial court's conduct did not deprive the defendant of his due process right to a fair and impartial trial. During jury selection, the trial court threatened to have the defendant's mouth taped shut after he interrupted the proceedings several times. The appropriate test to determine whether a trial court's comments or conduct pierced the veil of judicial impartiality is whether they were of such a nature that they unduly influenced the jury and thus deprived the defendant of a fair and impartial trial. A trial court has the discretion to gag an unruly, disruptive, rude, and obstreperous defendant when repeated warnings have been ineffective. The trial court did not carry out the threat, however, and the defendant's outbursts subsided. The trial court merely properly warned the defendant about what actions it could take if he continued to disrupt the trial. Moreover, despite some ambiguity in the record, it appears that the jury was not present when the trial court made the threat. If the jury was not present, the defendant's right to a fair and impartial jury was not violated.

2. The defendant's conviction of both first-degree home invasion and the felonious assault that formed the basis for the home invasion conviction did not violate the constitutional prohibition against double jeopardy. MCL 750.110a(9) clearly expresses a

legislative intent to allow multiple punishments for a conviction of both first-degree home invasion and another crime for the same incident.

3. At sentencing, a trial court must articulate on the record its reasons for imposing a sentence, but this requirement is satisfied if the trial court expressly relies on the sentencing guidelines or if it is clear from the context of the remarks preceding the sentence that the court relied on the guidelines. It is clear from the record in this case that the trial court impliedly relied on the sentencing guidelines.

4. The trial court plainly erred by inappropriately considering the defendant's refusal to admit guilt, and this error requires resentencing. A court cannot base its sentence even in part on a defendant's refusal to admit guilt. Resentencing is warranted if it is apparent that the court erroneously considered the defendant's failure to admit guilt, which may be indicated by actions such as asking a defendant to admit guilt or offering a lesser sentence if the defendant does so. While the trial court never expressly asked the defendant to admit his guilt, it essentially asked him the location of the gun used in the crimes. The defendant insisted at trial that he never had a gun, and thus never admitted that element of the charged offenses. Had the defendant responded to the trial court's implied inquiry, he essentially would have admitted all the elements. Thus, the trial court was asking him to admit guilt. The trial court's statements further implied that the court would sentence the defendant more leniently if he revealed the gun's location and effectively admitted his guilt.

5. MCL 769.34(10) does not apply to claims of constitutional error. MCL 769.34(10) provides that, if a defendant's minimum sentence is within the appropriate sentencing guidelines range, the Court of Appeals must affirm the sentence absent a guidelines scoring error or reliance on inaccurate information in determining the defendant's sentence. The minimum terms of the defendant's concurrent sentences are within the applicable sentencing guidelines ranges, and there is no scoring error or reliance on inaccurate information. A statutory provision, however, cannot authorize action in violation of the federal or state constitution. Thus, MCL 769.34(10) applies only to claims of nonconstitutional sentencing error. It cannot constitutionally be applied to preclude relief for sentencing errors of constitutional magnitude, such as the trial court's consideration of the defendant's refusal to admit guilt, which violated the defendant's constitutional right against self-incrimination.

Convictions affirmed; case remanded for resentencing.

1. SENTENCES — CONSIDERATIONS — REFUSALS TO ADMIT GUILT.

A trial court cannot base its sentence even in part on a defendant's refusal to admit guilt; resentencing is warranted if it is apparent that the court erroneously considered the defendant's failure to admit guilt, which may be indicated by actions such as expressly or impliedly asking the defendant to admit guilt or expressly or impliedly offering a lesser sentence if the defendant does admit guilt.

2. SENTENCES — CONSTITUTIONAL VIOLATIONS — APPEAL.

The Code of Criminal Procedure requires the Court of Appeals to affirm a minimum sentence that is within the appropriate sentencing guidelines range absent an error in scoring the sentencing guidelines or reliance on inaccurate information in determining the defendant's sentence, but this requirement cannot be applied to preclude relief for sentencing errors of constitutional magnitude (MCL 769.34[10]).

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, *Stuart J. Dunnings III,* Prosecuting Attorney, *Susan L. LeDuc,* Appellate Division Chief, and *John J. Murray,* Assistant Prosecuting Attorney, for the people.

*Michael A. Faraone* for the defendant.

Before: SMOLENSKI, P.J., WHITBECK, C.J., and O'CONNELL, J.

PER CURIAM. Defendant Aaron Conley appeals as of right his jury trial convictions of first-degree home invasion,[1] felonious assault,[2] and possession of a firearm during commission of a felony (felony-firearm).[3] The trial court sentenced Conley as a third-offense habitual offender[4] to serve prison terms of 16 to 40 years for the first-degree home invasion conviction, four to eight

---

[1] MCL 750.110a(2).

[2] MCL 750.82.

[3] MCL 750.227b.

[4] MCL 769.11.

years for the felonious assault conviction, and two years for the felony-firearm conviction. The terms for the home invasion conviction and the felonious assault conviction are to be served concurrently with each other, but consecutively to the term for the felony-firearm conviction. We affirm Conley's convictions, but remand for resentencing.

I. BASIC FACTS AND PROCEDURAL HISTORY

On the night of October 20, 2003, at about 9:00 p.m., Victor Lyons broke up a fight between Conley and another man. Lyons knew Conley because they lived across the street from one another. After the altercation, Lyons went into his house, where his eight children, his wife Lisa Hallock, his father-in-law Thomas Hect,[5] and his brother-in-law were. He was in the kitchen when he heard a loud bang and a man yelling racial slurs. According to Lyons, Conley kicked in the locked door, entered the doorway without permission, waived a gun, and yelled, "Come on out, nigger, what's up now." Lyons approached the front door carrying a baseball bat and saw that Conley had a small handgun. Lyons said he and Conley went outside, and Conley told him to put the bat down, so he did. After he put the bat down, Conley put the gun in his pocket. Lyons said Conley then walked up to him and hit him. Lyons said he fell on the ground and got back up, but Conley had run across the street. Hallock and Hect confirmed Lyons's testimony.

Conley testified that on the night of October 20, 2003, at approximately 9:00 p.m., he and Lyons smoked crack cocaine. Conley further testified that he and

---

[5] There was ambiguity in the record about whether Hallock and Lyons were married or dating.

another man had gotten into a fight that lasted about 15 minutes, and that the fight had ended with him and his brother being chased around the corner by Lyons and several other men. Ten minutes after the altercation, according to Conley, he went to Lyons's house. Conley saw Lyons standing outside the house near the curb and said the two of them were about to fight. According to Conley, Lyons ran into his house, and he thought Lyons was going to get something, so he stood on Lyons's porch and kicked the door twice. Conley said the door opened and Lyons came running out with a bat. Conley testified that he ran to his brother and grabbed a beer bottle. Conley said he and Lyons swung at each other with their respective weapons, but did not hit each other. Conley said he eventually hit Lyons and left. Conley testified that he never entered the home and never possessed a firearm.

## II. JUDICIAL CONDUCT

### A. STANDARD OF REVIEW

Conley argues that the trial court lacked impartiality, as indicated by the court's threat to tape his mouth shut. Therefore, Conley argues, he was denied his due process right to an impartial and fair trial. "In the absence of objection, this Court may review the matter if manifest injustice results from the failure to review."[6] We review this unpreserved issue for plain error.[7]

### B. THE INCIDENT IN QUESTION

The following occurred following jury selection:

*The Court*: Is there a problem, Mr. Lange?

---

[6] *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995).

[7] *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

*Mr. Lange (defense counsel)*: Can I approach?

*The Court*: No. Just don't make any noise, sir.

*Mr. Matwiejczyk (the prosecutor)*: Other witnesses present in the court, Victor Lyons.

*The Court*: Which one is Victor? Would you raise your hand? Victor? Thank you.

*Mr. Matwiejczyk*: Thomas Hecht and Lisa Hallock.

*The Court*: Thank you, folks. You can step back outside.

*The Court*: Now, Mr. Lange, did you wish to identify any witnesses?

*Mr. Lange*: Potentially, Your Honor, Nicholas Conley.

*The Court*: And is he here? All right. Would you stand and turn so everyone can see you, sir? Would you turn so everyone can see you? Thank you very much. Please be seated. Mr. Conley?

*[Nicholas] Conley*: I didn't know I was supposed to be a witness in court.

*The Defendant*: I am sorry, sir. None of my witnesses are here, sir.

*The Court*: If you have a concern, take it up with your attorney.

*The Defendant*: I tried to take it up with my attorney. Take the jury. How can I go with this trial. I have no witnesses. I'm sorry. I have no witnesses.

*The Court*: Sir, be quiet or you'll be going to jail for something else.

*The Defendant*: That's not right. I have already been here six months, sir.

*The Court*: I am going to keep somebody here. Bring Mr. Conley back. Keep your mouth shut. Sit down, sir. Sir, sit down. If this is what you want, I'm going to have the officers put this around your mouth.

*The Defendant*: I'm sorry, sir.

*The Court*: Are you going to talk?

*The Defendant*: No, sir.

*The Court*: When they come back, are you going to say one word? If you have a concern, take it up with your attorney. This will go around your mouth all the way around several times. You will be able to breathe, but won't be able to talk. Is that clear?

*The Defendant*: Yes, sir.

*The Court*: All right. Leave it right here. Just in case you want to act up. All right. Mr. Lewycky, bring everyone back.

(Jury present in the courtroom.)

*The Court*: You relatives, folks, friends, whoever you are, if you want to talk about it with the officers, go ahead and do it. No skin off my nose, you're not my friend. I'm not your friend. I won't shake my head either, sir. It's appropriate to stand up, Mr. Conley, when the jury comes in. It's appropriate for everybody to stand up when the jury comes in, including the Judge.

Now, my question, members of the jury, about everybody when we were interrupted was, do you know any of the persons who was [sic] identified as potential witnesses, anyone know any of the persons who were identified? All right. Thank you very much.

### C. ANALYZING JUDICIAL CONDUCT

The Sixth Amendment of the United States Constitution and article 1, § 20 of the Michigan Constitution guarantee a defendant the right to a fair and impartial trial. In *People v Collier*,[8] this Court set forth the following analysis for determining whether a trial court's comments or conduct deprived a defendant of his or her right to a fair and impartial trial:

Michigan case law provides that a trial judge has wide discretion and power in matters of trial conduct. *People v Cole*, [349 Mich 175, 199; 84 NW2d 711 (1957)]. This power,

---

[8] *People v Collier*, 168 Mich App 687, 698; 425 NW2d 118 (1988).

however, is not unlimited. If the trial court's conduct pierces the veil of judicial impartiality, a defendant's conviction must be reversed. *People v London,* 40 Mich App 124, 129-130; 198 NW2d 723 (1972); *People v Wilson,* 21 Mich App 36, 37-38; 174 NW2d 914 (1969). The appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments "were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial." *People v Rogers,* 60 Mich App 652, 657; 233 NW2d 8 (1975) . . . . See *People v Burgess,* 153 Mich App 715, 719; 396 NW2d 814 (1986).

In *Illinois v Allen,*[9] the United States Supreme Court set forth a number of permissible ways courts can handle an obstreperous defendant. In that case, the defendant continually interrupted court proceedings and responded to the trial court's questions with vulgar language.[10] Although the trial court continually asked the defendant to behave himself and threatened to remove him from the courtroom, the defendant continued to be disruptive.[11] In holding that the trial court was within its authority to remove the defendant from the courtroom, the Court noted, "We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . : (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."[12] Although the Court noted that the first method could affect the jury's feelings about a defendant and should be used as a last

---

[9] *Illinois v Allen,* 397 US 337, 343-344; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

[10] *Id.* at 339-341.

[11] *Id.*

[12] *Id.* at 343-344.

resort, the Court noted that "[I]n some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as [this defendant] did here."[13]

Similarly, this Court in *People v Kerridge*[14] addressed whether a trial court abused its authority in gagging an unruly defendant. Although the Court noted that gagging should only be considered as a last resort, the Court said that such a measure was appropriate when the defendant used vulgar language, repeatedly stated that he was not going to stand trial, attempted to leave the courtroom, and undressed himself in his cell.[15] Clearly, if a defendant is unruly, disruptive, rude, and obstreperous, a trial court is within its discretion to gag a defendant when repeated warnings have been ineffective.

In this case, Conley interrupted the court proceedings several times before the trial court issued its threat that it would have his mouth taped shut. Therefore, the trial court merely issued Conley a warning about what could happen if he chose to continue, or increase the frequency or volatility of his outbursts, as the trial court is advised to do pursuant to *Allen* and *Kerridge*. The trial court did not tape Conley's mouth shut. It appears from the record that his outbursts subsided, and the trial continued in an orderly fashion. Accordingly, we find that the trial court did not deny Conley's right to a fair trial when it properly warned him of what actions it could take if he continued to disrupt the trial proceedings.

[13] *Id.* at 344.

[14] *People v Kerridge*, 20 Mich App 184, 186-188; 173 NW2d 789 (1969).

[15] *Id.* at 188.

Additionally, we note that some ambiguity exists in the record regarding whether the jury was present when the trial court threatened to tape Conley's mouth shut. As the prosecution indicated in its brief on appeal, there are a number of references to the jury's absence that suggest the jury was not present during the remarks now challenged. Although the record clearly indicates the jury was present at the beginning of the exchange and then returned to the courtroom, the record does not indicate when the jury left the courtroom. Because the trial court's comment regarding taping Conley's mouth shut and its instruction to bring the jury back appear to be one continuous conversation without any interruptions, it appears that the jury was not present when the trial court made the threat. If the jury was not present during the exchange, Conley's right to a fair and impartial jury was not violated.[16] Moreover, a defendant is entitled to a fair trial, not a perfect trial.[17] Thus, we conclude that Conley is not entitled to relief on the basis of this issue.

### III. DOUBLE JEOPARDY

#### A. STANDARD OF REVIEW

Conley argues that the felonious assault charge formed the basis for the home invasion conviction and, therefore, the felonious assault conviction should be vacated because it violates double jeopardy. "A double jeopardy challenge presents a question of constitutional law that this Court reviews de novo."[18]

---

[16] See *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994) (where the record did not show that any member of the jury saw the defendant's leg irons, the record did not provide a basis for finding that the use of leg irons deprived the defendant of a fair trial).

[17] *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992).

[18] *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004).

### B. CONSTITUTIONAL PROVISIONS

Both the United States Constitution[19] and the Michigan Constitution[20] prohibit placing a defendant twice in jeopardy for a single offense. These guarantees are substantially identical and should be similarly construed.[21] "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense."[22] With regard to the protection from multiple punishments, a defendant's protected interest is in "not having more punishment imposed than that intended by the Legislature. The intent of the Legislature, therefore, is determinative."[23] Put otherwise, there is no multiple punishment double jeopardy violation if there is a clear indication of legislative intent to impose multiple punishments for the same offense.[24]

The first-degree home invasion statute provides that "[i]mposition of a penalty under this section does not bar imposition of a penalty under any other applicable law."[25] Therefore, as held by this Court in *People v Shipley*,[26] the Legislature clearly expressed an intent to

---

[19] US Const, Am V provides in relevant part, "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."

[20] Const 1963, art 1, § 15 provides in relevant part, "No person shall be subject for the same offense to be twice put in jeopardy."

[21] *People v Davis*, 472 Mich 156, 161-162; 695 NW2d 45 (2005).

[22] *Nutt, supra* at 574.

[23] *People v Robideau*, 419 Mich 458, 485; 355 NW2d 592 (1984).

[24] *People v Shipley*, 256 Mich App 367, 378; 662 NW2d 856 (2003), citing *People v Mitchell*, 456 Mich 693, 695-696; 575 NW2d 283 (1998).

[25] MCL 750.110a(9).

[26] *Shipley, supra* at 378.

allow multiple punishments in this context, that is, a conviction of both first-degree home invasion and another crime for the same incident. Accordingly, we conclude that Conley's convictions of first-degree home invasion and felonious assault did not violate the constitutional prohibition against double jeopardy.

### IV. SENTENCING

#### A. STANDARD OF REVIEW

Conley argues that, contrary to the requirement that the sentencing court articulate its reasons for the sentence, the trial court did not refer to any of the purposes of criminal sentencing or provide any reasons for imposing lengthy sentences. Additionally, Conley argues that the trial court asked him to admit guilt; acknowledged that if Conley admitted guilt, it would conflict with his right to appeal; asked defense counsel about his conversations with Conley; and told Conley that it would be more lenient if Conley admitted guilt. Generally, this Court reviews a trial court's sentencing decisions for an abuse of discretion.[27] However, in this case, Conley failed to preserve the issue for appeal. "[A] defendant pressing an unpreserved claim of error 'must show a plain error that affected substantial rights.' "[28]

#### B. ARTICULATED REASONS FOR IMPOSING SENTENCES

A trial court must articulate its reasons for imposing a sentence on the record at the time of sentencing.[29] "The purpose of the articulation requirement is to aid appellate review and avoid injustice on the basis of error

---

[27] *People v Cain*, 238 Mich App 95, 130; 605 NW2d 28 (1999).

[28] *People v Sexton*, 250 Mich App 211, 228; 646 NW2d 875 (2002), quoting *Carines, supra* at 774.

[29] *People v Triplett*, 432 Mich 568, 573; 442 NW2d 622 (1989).

at sentencing."[30] The articulation requirement is satisfied if the trial court expressly relies on the sentencing guidelines in imposing the sentence or if it is clear from the context of the remarks preceding the sentence that the trial court relied on the sentencing guidelines.[31]

Here, the trial court did not expressly rely on the sentencing guidelines when imposing the sentence. However, it is clear from the record that the trial court impliedly relied on the sentencing guidelines. Conley acknowledged that the presentence investigation report (PSI) was thorough and requested that the trial court sentence him at the low end of the sentencing guidelines. The prosecutor proposed a number of corrections to the PSI, and the trial court discussed the scoring guidelines at length with the prosecutor and defense counsel. The prosecutor also asked the trial court to follow the recommendation set forth in the PSI. Immediately preceding the trial court's sentence, the trial court questioned whether the PSI accurately reflected credit for days served. All these comments preceded the trial court's sentence. Therefore, we find that the case need not be remanded on this ground for resentencing because the trial court impliedly relied on the sentencing guidelines in imposing the sentence.

## C. RETALIATION

During sentencing, the following discussion took place:

> *The Court*: Okay. Well, you know, you realize the gentleman's convicted by a jury. He may wish to appeal the conviction, but it might go a whole lot easier if we had the

---

[30] *People v Terry*, 224 Mich App 447, 455; 569 NW2d 641 (1997).

[31] *People v Lawson*, 195 Mich App 76, 77-78; 489 NW2d 147 (1992).

weapon that was discussed in this matter. That's not available? Have you discussed that with your client?

*Mr. Lange*: It's still our position that he did not possess—

*The Court*: Did not have one. Okay. Well, the jury didn't believe him.          ·

"A court cannot base its sentence even in part on a defendant's refusal to admit guilt."[32] Resentencing is warranted if "it is apparent that the court erroneously considered the defendant's failure to admit guilt, as indicated by action such as asking the defendant to admit his guilt or offering him a lesser sentence if he did."[33] "[A] defendant's Fifth Amendment right against self-incrimination 'is fulfilled only when a criminal defendant is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." ' "[34] "This guarantee extends to the sentencing phase of the trial."[35]

The trial court never expressly asked Conley to admit his guilt. However, the trial court did essentially ask him the location of the gun used in the commission of the offenses for which he was convicted. During the trial, Conley admitted that he kicked down the door to Lyons's house, that he provoked Lyons to come outside and fight, that he intended to fight Lyons, and that he hit Lyons in the head. However, Conley insisted he never had a gun. Therefore, Conley admitted a majority of the elements of the offenses for which he was

---

[32] *People v Yennior*, 399 Mich 892 (1977).

[33] *People v Spanke*, 254 Mich App 642, 650; 658 NW2d 504 (2003).

[34] *Ketchings v Jackson*, 365 F3d 509, 512 (CA 6, 2004), quoting *Estelle v Smith*, 451 US 454, 468; 101 S Ct 1866; 68 L Ed 2d 359 (1981), quoting *Malloy v Hogan*, 378 US 1, 8; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

[35] *Ketchings, supra* at 512.

charged, except the elements requiring possession of a gun. Had Conley responded to the trial court's implied inquiry regarding the location of the gun, Conley would have essentially been admitting that he had been untruthful and that he had used a gun during the offenses. With such an admission, Conley would have admitted all the elements of the charged offenses. Therefore, by impliedly asking Conley the location of the gun, the trial court was asking him to admit his guilt.[36]

The trial court did not expressly state that if Conley revealed the location of the gun he would receive a lesser sentence. However, the offer of such a quid pro quo clearly existed. The trial court stated, "[Conley] may wish to appeal the conviction, but it might go a whole lot easier if we had the weapon that was discussed in this matter." Clearly, the implication of this was that Conley would have been sentenced more leniently if he informed the trial court of the gun's location and thereby effectively admitted his guilt. Thus, we conclude that the trial court plainly erred by inappropriately considering Conley's refusal to admit guilt as reflected in this effective offer of a lesser sentence.[37]

### D. MCL 769.34(10)

The prosecution points to MCL 769.34(10), which provides in relevant part:

> If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an

---

[36] See *People v Grable*, 57 Mich App 184, 189; 225 NW2d 724 (1974) (resentencing warranted where the plain inference was that if the defendant was honest with himself and admitted the crime, rehabilitation was a possibility).

[37] *Spanke, supra* at 650.

error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence.

Read literally in isolation, this language might seem to preclude this Court from granting relief on the basis of the trial court's error in considering Conley's refusal to admit guilt because it is undisputed that Conley was sentenced within the sentencing guidelines range and this error does not involve the scoring of the guidelines or the consideration of inaccurate information.

But the erroneous consideration of Conley's refusal to admit guilt was a constitutional error because it violated his constitutional right against self-incrimination. It is axiomatic that a statutory provision, such as MCL 769.34(10), cannot authorize action in violation of the federal or state constitutions.[38] Accordingly, we conclude that MCL 769.34(10) cannot constitutionally be applied to preclude relief for sentencing errors of constitutional magnitude. We do not hold MCL 769.34(10) to be unconstitutional. Rather, we construe MCL 769.34(10) as simply being inapplicable to claims of constitutional error.

We note that a statute should be construed as constitutional unless no construction avoiding unconstitutionality is possible.[39] Further, although a statutory "phrase or a statement may mean one thing when read in isolation, it may mean something substantially dif-

---

[38] See, e.g., *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 374; 663 NW2d 436 (2003) ("[N]o act of the Legislature can take away what the Constitution has given."); *Sharp v City of Lansing*, 464 Mich 792, 810; 629 NW2d 873 (2001) ("[I]t is axiomatic that the Legislature cannot grant a license to state and local governmental actors to violate the Michigan Constitution. In other words, the Legislature cannot so 'trump' the Michigan Constitution.").

[39] *Silver Creek, supra* at 379.

ferent when read in context."[40] Accordingly, statutory language should be read in the context of the entire act.[41] Read in isolation, the language of MCL 769.34(10) might appear to purport to generally preclude consideration of even constitutional sentencing errors if a sentence is within the appropriate sentencing guidelines range. However, this statutory provision is part of a larger statutory section. MCL 769.34 sets forth various statutory rules primarily related to the sentencing guidelines, but includes other statutory restrictions to govern trial courts at sentencing. Accordingly, read in context, MCL 769.34 may reasonably be understood as applying only to claims of nonconstitutional sentencing error. Thus, to avoid a reading of the relevant language of MCL 769.34(10) as being partially unconstitutional, we conclude that it is inapplicable to claims of constitutional sentencing error.

We affirm Conley's convictions, but remand for resentencing because the trial court plainly erred in considering Conley's refusal to admit guilt at the sentencing hearing. We do not retain jurisdiction.

---

[40] *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003).

[41] *Id.*